H.M.C.A. (P.R.), Inc., etc., H.M.C.A. (Carolina), Inc. y Max Olivera Mariani, demandantes y recurrentes, *v.* Ileana M. Colón Carlo, Contralor del Estado Libre Asociado de Puerto Rico, demandada y recurrida.

*Número:* RE-91-678 *Resuelto:* 30 de junio de 1993

*Pedro A. Jiménez* y *Wallace González Oliver*, de *González Oliver, Correa Calzada, Collazo Salazar, Herrero & Jiménez*, abogados de los recurrentes; *José Hamid Rivera* y *John F. Nevárez*, abogados de los recurridos.

El Juez Asociado Señor Hernández Denton emitió la opinión del Tribunal.

El 27 de noviembre de 1991, el Tribunal Superior dictó una sentencia parcial final al amparo de la Regla 43.5 de Procedimiento Civil, 32 L.P.R.A. Ap. III, mediante la cual determinó que la Contralor del Estado Libre Asociado, Hon. Ileana Colón Carlo, tiene facultad para requerir e inspeccionar unos documentos de H.M.C.A. (P.R.), Inc. y H.M.C.A. (Carolina), Inc. (en adelante nos referiremos a ambas como H.M.C.A.),[1] relacionados con la operación y administración del Hospital Subregional de Carolina por parte de las mencionadas entidades, ambas corporaciones privadas con fines de lucro organizadas al amparo de las leyes del Estado Libre Asociado de Puerto Rico. De dicha sentencia recurren ante nos las corporaciones demandantes y su Presidente y único accionista, el Lcdo. Max Olivera Mariani, alegando que erró el tribunal de instancia al reconocer a la Contralor el derecho de auditar sus actividades corporativas relacionadas con la prestación de servicios a pacientes privados en la mencionada facilidad gubernamental. Modificamos la sentencia recurrida.

I

El 1ro de julio de 1982, H.M.C.A. y el Estado Libre Asociado de Puerto Rico, representado por el entonces Secretario de Salud, Dr. Jaime Rivera Dueño, suscribieron el contrato Núm. 83-004. Mediante dicho contrato, el Departamento de Salud (en adelante el Departamento) enco-

---

(1) H.M.C.A. (Carolina), Inc. es una subsidiaria de H.M.C.A. (P.R .), Inc. Esta última es única dueña de las acciones de la primera. El único accionista de la primera es el Lcdo. Max Olivera Mariani. Aunque en algún momento el contrato objeto de esta cotroversia fue cedido por la matriz a su subsidiaria, toda la documentación previa y subsiguiente a la cesión siguió haciéndose a nombre de la corporación matriz. Por ello, y a los únicos efectos de preservar la claridad de la discusión, nos referiremos a ambas como si se tratara de una sola entidad. Procedemos de este modo sin que por ello prejuzguemos cuestión alguna sobre la independencia o identidad de ambas corporaciones, lo cual no es objeto de controversia en este caso.

mendó a H.M.C.A., en calidad de contratista independiente, la administración del Hospital Subregional de Carolina, una facilidad pública construida a un costo aproximado de $29.5 millones allá para 1981. Fijaron la duración del contrato a diez (10) años.

Así, H.M.C.A. asumió la obligación de proveer los servicios hospitalarios y ambulatorios a nivel secundario[2] a los pacientes médico-indigentes de la subregión de Carolina.[3] En vista de que la proporción de habitantes médico-indigentes de dicha subregión se estimaba en 50%, H.M.C.A. se comprometió a brindar una proporción igual de sus servicios a pacientes total o parcialmente médico-indigentes. Asumió, además, la obligación de contratar la facultad médica y demás empleados del hospital, quienes serían considerados empleados de H.M.C.A. y no del Gobierno. Se hizo responsable de preparar un presupuesto anual para la operación del hospital y someter al Departamento los resultados de una auditoría en relación con los costos de operación del hospital y su proporción con los cargos hechos al Estado por concepto de servicios médicos prestados a pacientes médico-indigentes. Finalmente, se comprometió a proveer el equipo y la maquinaria necesarios para la prestación de los servicios.

Por su parte, el Departamento asumió la obligación de pagar a H.M.C.A. una suma determinada a base del presupuesto que dicha corporación dedicara a proveer los servicios médicos a los pacientes médico-indigentes. Durante el primer año del contrato, se acordó un pago de $6

---

[2] El cuidado médico en Puerto Rico se organiza en tres (3) niveles. A nivel primario, se ofrece tratamiento ambulatorio o preventivo. Tal es el caso de los centros municipales de cuidado médico o de diagnóstico. A nivel secundario, se ofrecen servicios de hospitalización rutinaria y clínicas externas. Tal es el tipo de servicio que brindan la mayoría de los hospitales de área. Finalmente, a nivel terciario se ofrecen servicios médicos especializados de alta tecnología. Los hospitales regionales ofrecen generalmente este nivel de servicio. Ver Solicitud de revisión, Apéndice, pág. 184 esc. 5.

[3] Dicha subregión incluye los municipios de Carolina, Canóvanas, Trujillo Alto y Loíza.

millones.(⁴) También se comprometió a pagar un canon de arrendamiento mensual de $163,350 por el equipo y la maquinaria necesarios para la prestación de los servicios, y que H.M.C.A. proveyó. Al cabo del término del contrato entre las partes, el Departamento tendría la opción de comprar el equipo, descontándose de su precio el monto de los cánones pagados hasta entonces y una cantidad por depreciación.

El 1ro de diciembre de 1984 las partes suscribieron una enmienda al contrato para aumentar la proporción de servicios prestados a pacientes médico-indigentes en las facilidades del hospital en un 26%, para un total de 76%.(⁵) A cambio de dicho aumento, el Departamento pagó a H.M.C.A. la suma adicional de $1,250,000. El resto de los servicios, al igual que bajo los términos originales, podrían prestarse a pacientes privados.(⁶) Mediante la enmienda suscrita el 24 de agosto de 1987, se incrementaron a nivel terciario los servicios hospitalarios y ambulatorios a ser prestados por H.M.C.A.(⁷) A cambio de asumir dicha obligación, el Departamento aumentó en $175,000 los pagos mensuales que hacía a H.M.C.A. Mediante la enmienda de 24 de septiembre de 1987, las partes extendieron la duración del contrato hasta 1997.

El objetivo del Departamento al entrar en la relación contractual descrita fue asegurar que se rindieran los servicios médicos de calidad a pacientes médico-indigentes mediante una utilización eficiente de los recursos disponibles. Por su parte, y como corolario de la responsabilidad asumida, H.M.C.A. podría utilizar la facilidad pú-

---

(⁴) A pesar de que el contrato original proveía una compleja fórmula a base de la cual determinar el monto de los pagos anuales, las partes nunca la utilizaron. En su lugar, el Departamento pagaba a H.M.C.A. una mensualidad determinada a base de facturación por servicios prestados de mes a mes.

(⁵) El contrato Núm. 83-0004 fue objeto de varias enmiendas. Mencionamos tan sólo algunas de ellas.

(⁶) Son pacientes privados todos los que financian sus gastos médicos a través de planes médicos o de su propio pecunio, y no son, por lo tanto, médico-indigentes.

(⁷) Ver esc. 2.

blica cuya administración se le encargó para proveer los servicios a pacientes privados y cobrar por los mismos. Tanto los costos realizados como las ganancias percibidas por concepto de prestar servicios a dichos pacientes, corresponderían a H.M.C.A. Además, y aunque no se consideró esa posibilidad en el contrato, H.M.C.A. arrendó a terceros, bajo su responsabilidad, parte de las facilidades del hospital.[8]

Para el año fiscal 1988–1989, el Departamento habría desembolsado un gran total de $56,580,128.90 por concepto de pagos para la operación del hospital desde que comenzó la ejecución del contrato Núm. 83–004. Durante todo ese periodo, H.M.C.A. se sometió a auditorías por parte de firmas privadas de contadores, tal y como se estipuló en el contrato.

En 1987, la Contralor inició una investigación del Departamento de Salud con relación al referido contrato. Como parte de dichas investigaciones, requirió de H.M.C.A. y de su representante, el licenciado Olivera Mariani, una serie de documentos relacionados con la ejecución del contrato. El 27 de octubre de 1989, la Contralor expidió una citación formal dirigida a H.M.C.A. y al licenciado Olivera Mariani, mediante la cual solicitó lo siguiente:

a. Organigrama del Hospital incluyendo los nombres de los funcionarios y empleados principales que actúan como directores de departamentos o divisiones.

b. Procedimientos administrativos y contables que rigen las operaciones fiscales del Hospital.

c. Actas de reuniones celebradas relacionadas con la operación y administración del Hospital.

d. Copia de los siguientes informes:

1. Informes financieros y liquidaciones presupuestarias preparadas desde el 1 de julio de 1982 hasta el 30 de septiembre de 1989.

---

[8] Aunque las partes califican de subarrendamiento las actividades de H.M.C.A., preferimos el término *arrendamiento*, ya que sólo un arrendatario puede subarrendar. H.M.C.A. no es un arredatario de las facilidades del hospital.

2. Informes de intervención o investigaciones hechas por auditores externos o gubernamentales.

e. Cualesquiera otros libros, cartas, documentos, papeles, expedientes y todos los demás objetos relacionados que nuestros auditores estimen pertinentes para un completo conocimiento del asunto bajo investigación.

Los mismos serán entregados el 16 de noviembre de 1989 a las 9:00 a.m. en las Oficinas de HMCA Carolina, Inc., localizadas en el Hospital de Area de Carolina, y se les permitirá a los representantes de la Oficina del Contralor inspeccionarlos o reproducirlos, según éstos determinen. Solicitud de revisión, Apéndice, págs. 37–38.

H.M.C.A. objetó el requerimiento contenido en el inciso (e) de la citación, tanto por su amplitud como por implicar un registro de sus archivos corporativos. El 15 de noviembre de 1989 instó una demanda ante el Tribunal Superior, en la cual solicitó una sentencia declaratoria a los efectos de que la Contralor no tiene facultad para intervenir con los demandantes, que son corporaciones privadas, y que todo requerimiento debe dirigirse a éstos a través del Departamento de Salud, debe ser formal y debe, además, cumplir con un mínimo de especificidad de la información requerida. Solicitaron, además, un interdicto preliminar, otro permanente, así como daños y perjuicios. El 18 de abril siguiente la Contralor presentó una reconvención en la que solicitó autorización para inspeccionar toda la documentación relacionada con la ejecución del contrato Núm. 83-004.

El foro de instancia dividió el pleito en dos (2). Procedió, primeramente, a determinar el ámbito del poder investigativo de la Contralor. Solicitó de las partes sendos memorandos de derecho que ilustraran al tribunal sobre la facultad de la Contralor para intervenir con entidades privadas que contratan con el Gobierno. Conforme a dicha orden, las partes sometieron sus memorandos, así como memorandos suplementarios. En particular, discutieron la facultad de dicha funcionaria para auditar las actividades corporativas de H.M.C.A. en cuanto a los servicios que ésta provee a

los pacientes privados en el hospital gubernamental en cuestión.

Así las cosas, la Contralor solicitó al tribunal que dictara sentencia sumariamente. El tribunal dictó la sentencia solicitada, acogiendo la posición de la Contralor. Luego de un análisis ampliamente documentado, determinó que la Contralor tiene derecho a fiscalizar entidades privadas que reciben fondos públicos para la administración y operación de facilidades de salud o la prestación de servicios médicos. A esos efectos, concluyó que podía intervenir con los archivos de los demandantes relacionados con la administración y operación del Hospital Subregional de Carolina, que es una facilidad pública de cuyo uso éstos disfrutan. Sostuvo que esto le permitirá a la Contralor determinar la razonabilidad de los costos que el Departamento de Salud ha realizado por concepto de la operación del hospital bajo el contrato Núm. 83-004.

Explica el foro de instancia:

> El contrato 83–004 no convirtió al Hospital Sub–Regional de Carolina en un hospital privado. *Dicho contrato no fue una venta o un mero arrendamiento o usufructo de un edificio*, el cual los demandantes entonces optaron por utilizar para establecer un negocio privado de servicios de salud. Al contrario, *las metas y obligaciones de dicha facilidad ya estaban fijadas por ley. Al asumir la administración y operación del mismo, los demandantes lo hicieron bajo el esquema estatutario vigente, y sujeto a las metas y obligaciones ya trazadas para el Hospital.*
>
> Comoquiera que las responsabilidades y deberes del Hospital no se limitan solamente a los pacientes médico-indigentes, sino que se extiende [sic] a toda la población, es razonable concluir que la intervención y fiscalización gubernamental de dicha facilidad se extiende a todos sus aspectos, y no solamente a los servicios prestados a pacientes médico-indigentes. (Énfasis suplido.)(9)

El foro de instancia concluyó, además, que H.M.C.A. no tenía una expectativa razonable de intimidad en cuanto a

---

(9) Solicitud de revisión, Apéndice, pág. 285.

los documentos relacionados con la operación del Hospital, por ser el negocio de administración de hospitales un negocio extensamente reglamentado, y por ser los archivos en cuestión unos cuya preparación y conservación es requerida por ley.

En consecuencia, ordenó a los demandantes, aquí recurrentes, a cumplir con la citación impugnada, así como con otros requerimientos futuros que no fuesen demasiado indefinidos. Es decir, los requerimientos deben fijar unas categorías más o menos amplias de documentos que razonablemente puedan ser pertinentes a la investigación.

De dicha sentencia recurren ante nos H.M.C.A. y su Presidente, el licenciado Olivera Mariani, invocando la comisión de varios errores. Primeramente, sostienen que erró el tribunal de instancia al dictar sentencia sumariamente, por existir controversia real sustancial sobre hechos materiales. El resto de los señalamientos de error pueden resumirse en dos (2). Aducen que erró el tribunal al determinar que la Contralor tiene facultad para auditar sus operaciones en lo referente a los pacientes privados que atiendan en el Hospital. Sostienen, además, que erró al permitir un registro que contraviene la garantía constitucional contra registros y allanamientos irrazonables. Examinemos cada uno de los señalamientos por separado.

II

A. Por ser un planteamiento de umbral, examinamos primero la determinación del tribunal de instancia de dictar una sentencia parcial final por la vía sumaria. Aducen los recurrentes que existe una controversia sustancial en cuanto a si el Hospital Subregional de Carolina es una facilidad pública. Señalan que ello es un hecho material, puesto que la calificación del hospital como público determinó que el foro de instancia resolviera que la Contralor tenía poder para investigar las operaciones de las

recurrentes. Explican que esta controversia no puede dilucidarse meramente mediante una interpretación del contrato, sino que requiere examinar la intención de las partes y la manera en que el contrato se implantó en la práctica. Finalmente, sostienen que el tribunal no debió resolver por la vía sumaria este caso por ser un caso complejo, cargado de un gran interés público. No tienen razón los recurrentes.

 En aras de aligerar la tramitación de los casos y garantizar su solución justa, rápida y económica, la Regla 36.2 de Procedimiento Civil de 1979 (32 L.P.R.A. Ap. III) permite que un tribunal dicte una sentencia para disponer de parte o de la totalidad de una reclamación sin la necesidad de celebrar un juicio en los méritos. *Méndez Arocho v. El Vocero de P.R.*, 130 D.P.R. 867 (1992); *Corp. Presiding Bishop CJC of LDS v. Purcell*, 117 D.P.R. 714, 719–720 (1986). Un tribunal puede dictar una sentencia sumariamente cuando no haya controversia real sustancial en cuanto a ningún hecho material, siempre que la misma proceda conforme a derecho. *J.A.D.M. v. Centro Com. Plaza Carolina*, 132 D.P.R. 785 (1993); *Pérez v. Advisors Mortgage Investors*, 130 D.P.R. 530 (1992); *Tello, Rivera v. Eastern Airlines*, 119 D.P.R. 83, 87 (1987); *Carrillo Norat v. Camejo*, 107 D.P.R. 132, 139 (1978).

 A los fines de considerar la moción para que se dicte sentencia sumariamente, se tendrán como ciertos todos los hechos no controvertidos que consten en los documentos y en las declaraciones juradas ofrecidas por la parte promovente. No obstante, tales documentos deben verse de la forma más favorable a la parte que se opone a la moción. Como regla general, la parte opositora no podrá derrotar la moción si meramente descansa en sus alegaciones. Deberá presentar declaraciones juradas y documentos que controviertan los presentados por el promovente. *Méndez Arocho v. El Vocero de P.R.*, supra; *Corp. Presiding Bishop CJC of LDS v. Purcell*, supra, pág.

721. Finalmente, en el ejercicio de su sana discreción, el tribunal puede abstenerse de resolver sumariamente casos complejos o que involucren cuestiones de interés público. *Corp. Presiding Bishop CJC of LDS v. Purcell* supra, pág. 723.

B. En este caso, el juez de instancia recibió una prueba documental que incluyó el contrato, sus enmiendas, correspondencia entre las partes e informes de los desembolsos del Departamento, entre otros. Los recurrentes no objetaron ninguno de dichos documentos. Tampoco presentaron documentos en oposición a la solicitud para que se dictara sentencia sumariamente. De los documentos presentados se desprende que no existía controversia sustancial sobre los hechos materiales.

La naturaleza pública o privada del negocio que corren los recurrentes en el hospital que administran no es un hecho determinante de la facultad de la Contralor para intervenirlos. Por lo tanto, una controversia en torno a ese hecho, de existir, no versaría sobre un hecho material y no impediría que el tribunal dictara una sentencia parcial final por la vía sumaria.

Como veremos más adelante, la facultad investigativa de la Contralor depende más bien de que esté implicado un desembolso de fondos públicos o el uso de propiedades públicas. En consecuencia, la existencia de esos desembolsos sí es un hecho material a la controversia de marras. La prueba demostró que esos desembolsos sí ocurrieron.

Es un hecho indisputado que la facilidad hospitalaria que administra la recurrente H.M.C.A. es propiedad del Estado. Se construyó a un costo al erario de $29.5 millones. Tampoco está en controversia que la administración de dicha facilidad se le encomendó a las recurrentes mediante un contrato que les impuso la obligación de brindar un por ciento sustancial de sus servicios a pacientes médico-indigentes. El Departamento se obligó, por su parte, a fi-

nanciar dichos servicios mediante desembolsos anuales millonarios de fondos públicos.

En vista de que no existía controversia sobre hechos materiales, no erró el foro de instancia al disponer de la controversia por la vía sumaria, a base de su interpretación del Derecho.

El interés público que caracteriza la controversia no era óbice para la utilización del mecanismo sumario en este caso y no abusó de su discreción el juez de instancia al utilizarlo. Cuando un juicio en los méritos resulta superfluo y no hay controversia sustancial sobre los hechos materiales, se sirven mejor los fines de la justicia y la economía procesal dictando sentencia sumariamente. Los recurrentes no han puesto a este Foro en posición de evaluar qué, si algo, podría haber aportado la celebración de un juicio en su fondo. Por cuanto, no erró el tribunal de instancia al valerse del mecanismo de la sentencia sumaria parcial.

## III

A. Examinamos ahora la facultad de la Contralor del Estado Libre Asociado de Puerto Rico para investigar a los recurrentes. Primeramente, enfrentamos la interrogante de si la Contralor tiene autoridad para intervenir con empresas privadas que reciben fondos públicos o utilizan propiedades públicas. Sólo de resolverla en la afirmativa procederá analizar el ámbito permisible de esa autoridad.

Los recurrentes argumentan que el hecho de que una empresa privada contrate con el Gobierno para brindar servicios previamente brindados por éste, no convierte a esa entidad en una cuasi-pública, a los efectos de que se le someta a los poderes investigativos de la Contralor. Señalan que las leyes y los reglamentos vigentes han conferido ese poder, de manera limitada, únicamente al Departamento de Salud, y no a la Contralor.

Por su parte, la Contralor argumenta que la Constitución del Estado Libre Asociado impone sobre su Oficina la encomienda de velar por que se disponga de las propiedades y los fondos públicos sólo para fines públicos y mediante autorización de ley. En virtud de dicho mandato, reclama la facultad para investigar el contrato mediante el cual se encomendó la administración de una propiedad pública a una entidad privada, a un costo millonario al erario. Tiene razón la Contralor.

■ En nuestro ordenamiento, el cargo de Contralor tiene génesis constitucional. El Informe de la Comisión de la Rama Legislativa de la Convención Costituyente recomendó su creación como parte de una serie de medidas dirigidas a proveer una sana fiscalización de las cuentas, los ingresos y los desembolsos gubernamentales.[10] 4 Diario de Sesiones de la Convención Constituyente 2587–2588 (1951). Según se desprende de los debates de la Convención Constituyente, el cargo de Contralor se crea para fiscalizar las cuentas públicas. Su intervención habría de ocurrir una vez efectuados los desembolsos, con el objetivo de determinar si fueron hechos conforme a la ley. Por corresponder esa labor a la función fiscalizadora de la Rama Legislativa, se asignó el cargo de Contralor a esa rama. *E.L.A. v. Asoc. Empleados Obras Púb. Mun.*, 126 D.P.R. 320 (1990); *Zequeira v. Universidad de P.R.*, 76 D.P.R. 338, 343 (1954); Diario de Sesiones, *supra*, T. 2, págs. 920 y 925.

■ El Art. III, Sec. 22 de nuestra Constitución, L.P.R.A., Tomo 1, incorporó la intención de la Convención Constituyente y creó el cargo de Contralor, adscrito a la Rama Legislativa, con amplios poderes investigativos. *In re Ríos*, 112 D.P.R. 353, 361 (1982); Diario de Sesiones, *supra*, T. 4, pág. 2588. Lee la referida Sec. 22:

---

[10] Cuando se utilizan los fondos públicos para fines ilícitos, quien se perjudica, no sólo en lo económico, sino en lo moral, es la ciudadanía en general. *E.L.A. v. Soto Santiago*, 131 D.P.R. 304 (1992).

Habrá un Contralor que será nombrado por el Gobernador con el consejo y consentimiento de la mayoría del número total de los miembros que componen cada Cámara. *El Contralor reunirá los requisitos que se prescriban por ley; desempeñará su cargo por un término de diez años y hasta que su sucesor sea nombrado y tome posesión. El Contralor fiscalizará todos los ingresos, cuentas y desembolsos del Estado, de sus agencias e instrumentalidades y de los municipios, para determinar si se han hecho de acuerdo con la ley.* Rendirá informes anuales y todos aquellos informes especiales que le sean requeridos por la Asamblea Legislativa o el Gobernador.

*En el desempeño de sus deberes el Contralor estará autorizado para tomar juramentos y declaraciones y para obligar, bajo apercibimiento de desacato, a la comparecencia de testigos y a la producción de libros, cartas, documentos, papeles, expedientes, y todos los demás objetos que sean necesarios para un completo conocimiento del asunto bajo investigación.*

El Contralor podrá ser separado de su cargo por las causas y mediante el procedimiento establecido en la sección precedente. (Énfasis suplido.) Art. III, Sec. 22, Const. E.L.A., L.P.R.A., Tomo 1, ed.1982, págs. 347–348.

Para complementar las disposiciones sobre el cargo de Contralor, y en ánimo de limitar el ámbito permisible del dispendio de fondos públicos, la Comisión de la Rama Legislativa recomendó la adopción de la actual Sec. 9 del Art. VI de nuestra Constitución, L.P.R.A., Tomo 1. Ésta provee que "[s]ólo se dispondrá de las propiedades y fondos públicos para fines públicos y para el sostenimiento y funcionamiento de las instituciones del Estado, y en todo caso por autoridad de ley". Art. VI, Sec. 1, Const. E.L.A., L.P.R.A., Tomo 1, ed. 1982, pág. 369.

El mandato constitucional se implantó mediante la Ley Núm. 9 de 24 de julio de 1952, la cual creó la Oficina del Contralor, bajo la dirección del Contralor, y bajo la responsabilidad de la Asamblea Legislativa. 2 L.P.R.A. sec. 71; *E.L.A. v. Asoc. Empleados Obras Púb. Mun.*, supra, pág. 327. El Art. 3 de la referida ley impone al Contralor el deber de ejercer sus facultades constitucionales "tanto con respecto a las cuentas, los fondos, los ingresos, los desem-

bolsos y las propiedades del gobierno como a los que se tuvieren en fideicomiso". 2 L.P.R.A. sec. 73.

■ Nuestro ordenamiento provee al Contralor de los instrumentos necesarios para poner en vigor su mandato constitucional de manera efectiva. En caso de que alguna persona se niegue a cumplir con un requerimiento del Contralor al amparo de su poder constitucional para citar testigos y compeler la presentación de evidencia, éste tiene facultad de solicitar al tribunal que ordene la presentación de la evidencia o el testimonio requerido, so pena de desacato. 2 L.P.R.A. sec. 79. También puede requerir a los organismos del Gobierno que le faciliten el personal profesional y técnico, de entre sus empleados, para ayudar al cumplimiento de las funciones fiscalizadoras de su Oficina. 2 L.P.R.A. sec. 73a. Incluso, la ley le permite contratar los servicios de peritos privados cuando las investigaciones requieran personal altamente especializado. 2 L.P.R.A. 73a.

■ Por otro lado, la Ley Núm. 18 de 30 de octubre de 1975 enmendó la ley Núm. 9, *supra*, para requerir que los departamentos, las agencias, las instrumentalidades, las oficinas y todo otro organismo o municipio del Estado Libre Asociado, lleven un registro de todos los contratos que otorguen, con sus enmiendas, y remitan copia de los mismos a la Oficina del Contralor. 2 L.P.R.A. sec. 97; *Ocasio v. Alcalde Mun. de Maunabo*, 121 D.P.R. 37, 54 (1988). Además, el Art. 74-A del Código Político de 1902, según enmendado por la Ley Núm. 86 de 13 de julio de 1988 (3 L .P.R.A. sec. 82a) impone sobre las agencias el deber de reportar al Contralor cuando cualquier persona, sea empleado o persona particular, haya utilizado o se haya beneficiado de bienes o fondos públicos bajo su control o custodia. *E.L.A. v. Great Amer. Ins. Co.*, 106 D.P.R. 825, 832 (1978).

Finalmente, la Ley Núm. 17 de 8 de mayo de 1973 (3 L.P.R.A. sec. 136) encomienda a la Oficina de Asuntos del Contralor, adscrita al Departamento de Justicia, el deber

de ejercer todas las acciones civiles y criminales que surjan como resultado de las investigaciones del Contralor. Así, se hacen valer las determinaciones del Contralor, se salvaguarda la honestidad administrativa y se preserva la legalidad en el manejo de fondos públicos. *E.L.A. v. Soto Santiago*, 131 D.P.R. 304 (1992).

■■■ Hemos resuelto antes que las facultades del Contralor del Estado Libre Asociado se extienden para incluir la fiscalización de los fondos públicos en manos de corporaciones públicas o público-privadas. *Commoloco of Caguas, Inc. v. Benítez Díaz*, 126 D.P.R. 478 (1990); *P.R. Tel. Co. v. Rivera*, 114 D.P.R. 360, 362–363 (1983). Dicha norma se sostiene sobre el reconocimiento de que los fondos con que operan son públicos. *Comoloco of Caguas, Inc. v. Benítez Díaz,* supra; *P.R. Tel. Co. v. Rivera*, supra, pág. 362; *Torres Ponce v. Jiménez*, 113 D.P.R. 58, 64 (1982).[11] Además, se considera que las referidas entidades prestan con frecuencia unos servicios esenciales y tienen una mayor obligación de examinar sus costos y rendir cuentas de sus operaciones. A pesar de gozar de una autonomía operacional análoga a la que disfrutan las corporaciones privadas, las corporaciones públicas y público-privadas están revestidas de un apremiante interés gubernamental en que su funcionamiento sea de la más alta calidad y eficiencia.

B. El caso de marras presenta una situación fáctica distinguible de aquella en que se encuentran las corporaciones públicas y público-privadas. La recurrente, H.M.C.A., es una corporación privada organizada al amparo de la Ley de Corporaciones de Puerto Rico, con todos los derechos y las prerrogativas que nuestro ordenamiento le reconoce. La totalidad de sus acciones pertenecen en propiedad a

---

[11] Antes de que esta Curia reconociera jurisprudencialmente la facultad fiscalizadora de la Oficina del Contralor sobre las finanzas de la Telefónica, no existía disposición estatutaria alguna que confiriera expresamente esta facultad. Posteriormente, la Asamblea Legislativa la incorporó de manera expresa mediante la Ley Núm. 92 de 4 de junio de 1983 (27 L.P.R.A. sec. 409).

personas privadas. Por ende, no podemos calificàr a H.M.C.A. como una instrumentalidad pública o agencia gubernamental y así extender a todas sus finanzas las facultades fiscalizadoras del Contralor del Estado Libre Asociado.

Sin embargo, un examen responsable de las facultades del Contralor no puede terminar con una clasificación mecánica de la naturaleza pública o privada de la entidad intervenida. Nuestra Constitución, así como los estatutos que la implantan, conciben el legado de autoridad al Contralor en lenguaje amplio y general. Por lo tanto, nuestra tarea interpretativa consiste en reconocer en la figura del Contralor unos poderes investigativos tan amplios como sean necesarios para desempeñar cumplidamente su encomienda constitucional.[12]

Es tarea germinal del Contralor determinar la legalidad de todas las cuentas, los ingresos y los desembolsos de propiedades y fondos públicos. Para la consecución de esa tarea nuestro ordenamiento le confiere un vasto poder para investigar. Según el preclaro imperativo constitucional, ese poder se extiende para requerir aquella evidencia testifical o de documental que sea necesaria para el más cabal entendimiento de la materia bajo investigación. Por lo tanto, la autoridad del Contralor para requerir la

---

[12] Al definir los poderes investigativos de la Asamblea Legislativa, este Foro ha adoptado una postura similar. En el ejercicio de su facultad y deber de fiscalizar la ejecución de la política pública y a los jefes de Departamento, la Asamblea Legislativa goza de vastos poderes de investigación. Esos poderes son inseparables de la facultad de legislar. *Peña Clos v. Cartagena Ortiz*, 114 D.P.R. 576, 590 (1983). Por eso, la facultad investigativa de la Legislatura es tan amplia como sea necesario para cumplir la función legislativa, y se extiende a personas privadas. LVIII Op. Sec. Just. Núm. 29-1987; LVIII Op. Sec. Just. Núm. 44-1987. En última instancia, sin embargo, la facultad no es absoluta, y corresponde a este Foro demarcar sus contornos. *Peña Clos v. Cartagena Ortiz*, supra, pág. 591; *Hernández Agosto v. Betancourt*, 118 D.P.R. 79, 82 (1986).

Distinto es el caso cuando a un funcionario se le concede una autorización para investigar un asunto en específico. En ese caso, los asuntos en los que pueda intervenir se interpretan restrictivamente, aunque dentro del ámbito de la autoridad conferida, la agencia o funcionario goce de un amplio poder para actuar. *Pueblo v. Pérez Casillas*, 126 D.P.R. 702 (1990).

producción de testimonio o de documentos se determina según su pertinencia con un asunto legítimamente objeto de fiscalización. Ello implica que, cuando el curso de una investigación de los desembolsos públicos así lo exija, el Contralor podrá requerir información de entidades privadas hasta donde sea necesario para esclarecer el asunto en cuestión.[13] Lo antes dicho determina la facultad de la Contralor para intervenir con la corporación recurrente en este caso.[14]

La facultad de la Contralor de investigar la legalidad de los desembolsos realizados por el Departamento instrumentalidad del Estado, surge indubitadamente del texto constitucional, así como del estatuto que lo implanta. Al amparo de esa facultad, la Contralor puede legítimamente investigar el contrato mediante el cual el Departamento confió la administración de una facilidad hospitalaria, propiedad del Estado, a una entidad privada. Igualmente, puede investigar la legalidad de los desembolsos de fondos públicos hechos por el Departamento como parte de sus obligaciones bajo ese contrato.

C. Resolver de otro modo dejaría fuera del ámbito fiscalizador del Contralor una porción sustancial de los desem-

---

[13] En *Comisionado de Seguros v. Bradley*, 98 D.P.R. 21, 33 (1969), expresamos que no debemos interpretar restrictivamente el poder investigativo de ese funcionario. Así, cuando las circunstancias lo justifican, ese poder puede extenderse a otras entidades o empresas que hayan tenido relaciones comerciales o económicas con las entidades de seguros que el Comisionado está expresamente autorizado a investigar. Formulamos la norma de que, en investigaciones administrativas, el hecho de que los documentos requeridos pertenezcan a terceros no los pone fuera del alcance de una investigación válidamente dentro del ámbito de autoridad de la agencia. Este argumento aplica a fortiori al Contralor del Estado Libre Asociado.

[14] Los recurrentes señalan en su alegato que la autoridad del Contralor General de Estados Unidos para intervenir con entidades privadas que realicen contratos con el Gobierno surge expresamente de la ley. Argumentan que, a falta de una autorización estatutaria similar, la Contralor del Estado Libre Asociado carece de igual facultad. Es desacertado su señalamiento. Las leyes y los reglamentos relativos a la figura del Contralor General federal no nos obligan. *P.R. Tel. Co. v. Rivera*, 114 D.P.R. 360, 362 (1982). El Contralor en Puerto Rico es un funcionario de rango constitucional, con facultades investigativas generales. Su homólogo federal es de creación estatutaria. Su poder de investigar entidades privadas que contratan con el Gobierno ha sido limitado por estatuto. *Bowsher v. Merck & Co., Inc.*, 460 U.S. 824, 831 (1983); 41 U.S.C. sec. 254(c); 10 U.S.C. sec. 2313(b).

bolsos de fondos y propiedades públicos, a riesgo de burlar la promesa constitucional de que serán destinados a fines públicos. Con frecuencia, la realidad económica actual empuja al Gobierno a contratar con la empresa privada la prestación de servicios que antes proveía directamente. Ello le permite reducir los costos, pero genera la necesidad de diseñar mecanismos para supervisar y evaluar la ejecución del contrato. La controversia de marras es un vivo ejemplo de este problema.

La Ley Núm. 132 de 9 de junio de 1973 (24 L.P.R.A. sec. 58) autorizó la creación del Hospital Subregional de Carolina con el propósito de brindar unos servicios de salud adecuados a la ciudadanía de esa área. 24 L.P.R.A. sec. 58(b). El Art. 5 de la Ley Núm. 26 de 13 de noviembre de 1975 (24 L.P.R.A. sec. 337d) autorizó al Departamento, a través de la Administración de Facilidades y Servicios de Salud (A.F.A.S.S.) a contratar para la administración de facilidades de salud tales como el Hospital Subregional de Carolina. La medida se aprobó para

... [F]omentar una administración y operación de facilidades y servicios de salud de alta eficiencia con la flexibilidad necesaria que propenda a la *integración y coordinación de unos servicios de salud accesibles para todo el Pueblo de Puerto Rico, que es la responsabilidad constitucional e ineludible de cualquier gobierno responsable.* (Énfasis suplido.) 24 L.P.R.A. sec. 337.

Para velar por el desarrollo saludable de esta política pública, se encomendó al Secretario de Salud el deber de determinar y fijar el costo razonable de los servicios de salud prestados en las facilidades administradas y que son propiedad del Estado Libre Asociado. Ley Núm. 56 de 21 de junio de 1969 (24 L.P.R.A. sec. 61). Esto comprende los costos de operación del Hospital Subregional de Carolina. Mediante nuestra decisión hoy, complementamos el esquema anterior. Reconocemos a la Contralor la facultad de velar que el Departamento de Salud, así como otras instrumentalidades gubernamentales que contraten con la

empresa privada, no abdiquen a su deber de supervisar que las propiedades y los fondos públicos que comprometen se dediquen a los fines disputados en la ley y en el contrato.

El resultado anterior responde a que la facilidad objeto del contrato fue construida con fondos públicos y para fines públicos. Como explicáramos anteriormente, su creación fue autorizada por ley, 24 L.P.R.A. sec. 58, y obedeció a la necesidad de proveer un servicio esencialísimo a la ciudadanía de la subregión de Carolina. 24 L.P.R.A. sec. 58(b). El hecho de que la política pública se implantara a través de un contrato de administración con una compañía privada no alteró ni podía alterar legalmente el carácter público de la facilidad, ni el requisito constitucional de que fuera utilizada para fines públicos.

## IV

Admitida la facultad del Contralor para investigar los desembolsos realizados por el Departamento en la contratación con entidades privadas, pasemos a examinar los requisitos de validez de la intervención. Al examinar la legalidad del requerimiento hecho a H.M.C.A. por la Contralor, tenemos presente que ésta acepta la manera en que el ilustrado foro de instancia delimitó el alcance de su poder investigativo. También tenemos presente que los recurrentes impugnan tan sólo el inciso (e) de la citación, así como el hecho de que la Contralor exija registrar sus facilidades en busca de documentos pertinentes sin haber obtenido previamente una orden judicial de registro. Por ser planteamientos distintos,[15] examinamos primero el ámbito permisible de un requerimiento de documentos. Luego, examinaremos los requisitos de validez de un registro administrativo.

---

[15] Ver *Hernández Soto v. Gutiérrez Díaz*, 115 D.P.R. 697, 698 (1984).

A. Los recurrentes sostienen que la facultad investigativa de la Contralor no se extiende de manera irrestricta al sector privado. En cuanto a los hospitales públicos administrados por corporaciones privadas, aducen que el poder investigativo de la Contralor se limita a aquellos aspectos de la operación cuya investigación ha sido autorizada por ley o por el contrato entre las partes. Señalan que la ley circunscribe la facultad investigativa del Gobierno a los gastos realizados en relación con la prestación de servicios a los pacientes médico-indigentes. Luego, reclaman que la Contralor no podría intervenir con sus finanzas en cuanto éstas conciernen a la prestación de servicios a pacientes privados.

Por su parte, la Contralor señala que su oficina tiene la facultad para investigar todos los negocios que realice la recurrente mediante la utilización de una facilidad pública. Aduce que la sentencia emitida por el tribunal de instancia correctamente delimitó el ámbito de la investigación a todo documento "directamente relacionad[o] con la administración y operación del hospital, incluyendo todos los negocios llevados a cabo allí por HMCA ([P.R.]) por virtud o como resultado de su uso y posesión del inmueble".[16]

Las citaciones administrativas que se utilizan para obtener información en el curso de una investigación, son instrumentos vitales para que las agencias puedan cumplir las funciones que se les encomiendan.[17] Aunque es común que las agencias obtengan información de manera voluntaria, con frecuencia se les delega mediante legislación el poder de obligar a las personas a que les suministren la información que necesiten.[18] El poder de requerir

---

[16] Alegato de la reccurida, pág. 4.

[17] Para una excelente discusión de los desarrollos jurisprudenciales del poder investigativo de las agencias, a la luz de la Constitución federal, refiérase a 1 *Davis*, *Administrative Law Treatise* Sec. 4.1 (2da ed. 1978).

[18] Lo que no puede delegarse a las agencias, por ser incompatible con la garantía constitucional de que nadie será privado de su libertad o propiedad sin un debido procedimiento de ley, es el poder de castigar como desacato el incumplimiento

información de manera coercitiva incluye el poder de citar testigos y el de requerir la producción de documentos.[19] Su ejercicio no queda al margen de los postulados constitucionales que informan nuestro ordenamiento.

El Art. II, Sec. 10 de nuestra Carta de Derechos, Const. E.L.A., L.P.R.A., Tomo 1, encarna la protección contra registros y allanamientos irrazonables. La garantía de esa disposición se extiende para proteger a los ciudadanos contra citaciones irrazonables de las agencias administrativas. *E.L.A. v. Coca Cola Bott. Co.*, 115 D.P.R. 197, 206 (1984); *E.L.A. v. P.R. Tel. Co.*, 114 D.P.R. 394, 401 (1983). Al demarcar los contornos de esa protección, no nos constriñe la interpretación que de la cláusula análoga de la Constitución federal haga el Tribunal Supremo de esa jurisdicción. Ésta sólo determina el contenido mínimo de las garantías que debemos reconocer al palio de la nuestra. *Pueblo v. Muñoz, Colón y Ocasio*, 131 D.P.R. 965 (1992); *Rodríguez Rodríguez v. E.L.A.*, 130 D.P.R. 562 (1992).

El Tribunal Supremo federal ha reconocido un amplio poder investigativo a las agencias administrativas para requerir documentos corporativos. La Cuarta Enmienda de la Constitución federal, que consagra la protección contra registros y allanamientos irrazonables, sólo exige que el requerimiento no sea demasiado indefinido y que sea pertinente a un objetivo legítimo de la agencia. Ver, *e.g., Civil Aeronautics Board v. Hermann*, 353 U.S. 322 (1957) (es válido el requerimiento de prácticamente todos los documentos y libros corporativos correspondientes a un período de 38 meses); *United States v. Morton Salt Co.*, 338 U.S. 632, 652 (1950); *Okla. Press Pub. Co. v. Walling*, 327 U.S. 186, 208–209 (1946).

---

de sus requerimientos. *Interstate Commerce Comm. v. Brimson*, 154 U.S. 447, 485 (1894).

[19] A ese poder se le denomina también como el poder de *subpoena ad testificandum*, cuando se requiere meramente testimonio, o *subpoena duces tecum*, cuando se requiere que se comparezca ante la agencia para producir documentos. Schwartz, *Administrative Law, A Casebook*, 2da ed., 1982, págs. 201–202.

█ Bajo nuestra Constitución, es norma claramente establecida que la razonabilidad de un requerimiento administrativo depende de que concurran tres (3) circunstancias: primeramente, la investigación que se lleva a cabo ha de estar dentro de la autoridad conferida por ley a la agencia; segundo, el requerimiento no debe ser demasiado indefinido, y tercero, la información solicitada debe ser razonablemente pertinente al asunto específico bajo investigación. *E.L.A. v. P.R. Tel. Co.*, supra, pág. 402; *P.N.P. v. Tribunal Electoral*, 104 D.P.R. 741, 747–748 (1976); *Comisionado de Seguros v. Bradley*, 98 D.P.R. 21, 31 (1969). La determinación de pertinencia corresponde inicialmente al funcionario que realiza la investigación. *Comisionado de Seguros v. Bradley*, supra, pág. 34. No obstante, de surgir cualquier controversia al respecto, corresponde a los tribunales, como intérpretes últimos de la compatibilidad del ejercicio del poder investigativo gubernamental con los postulados constitucionales (*Peña Clos v. Cartagena Ortiz*, supra, pág. 591), dirimir asuntos de pertinencia.

Al aplicar la normativa antes expuesta al caso de marras, tenemos que concluir que el requerimiento de información que nos ocupa cumple con las tres (3) condiciones que determinan su razonabilidad. Ya vimos que la Contralor tiene la autoridad constitucional para intervenir con partes privadas si ello es necesario para poder cumplir su función de fiscalizar los desembolsos de fondos y propiedades públicas hechos por una instrumentalidad del Estado.

El requerimiento contenido en el inciso (e) de la citación, según delimitado por el foro de instancia, tampoco es demasiado indefinido. Se refiere a una categoría más o menos amplia que comprende los documentos corporativos razonablemente relacionados con el uso de las facilidades del Hospital Subregional de Carolina, por parte de H.M.C.A., en virtud de su contrato con el Departamento para administrar y operar el inmueble. Ello incluye los documentos

corporativos relacionados con la prestación de servicios a los pacientes privados en las facilidades del hospital.

Finalmente, se cumple con el requisito de pertinencia. Los documentos requeridos son aquellos razonablemente relacionados con la investigación que realiza la Oficina de la Contralor de los desembolsos de propiedades y fondos públicos realizados por el Departamento. Los documentos relacionados a la prestación de servicios a pacientes privados son pertinentes a esa investigación. Sólo examinando la totalidad de las actividades llevadas a cabo por H.M.C.A. en el hospital podrá la Contralor determinar si los fondos y las propiedades públicas implicados se han destinado conforme a la ley.

▆▆ Aunque el requerimiento deposita en manos de la Oficina de la Contralor la determinación inicial de pertinencia, preservamos como salvaguarda contra el amplio poder investigativo que hoy reconocemos, la facultad suprema de los tribunales para dirimir controversias sobre este último requisito. Ver, *e.g., Donovan v. Lone Steer, Inc.*, 464 U.S. 408, 415 (1984) (aunque una agencia administrativa puede expedir una citación sin obtener antes una orden judicial para ello, el requerido tiene derecho a cuestionar su razonabilidad en un tribunal antes de ser penalizado por su incumplimiento).

B. Para disponer del caso de marras, nos resta determinar si el método escogido por la Contralor para efectuar el requerimiento cuyo ámbito aquí refrendamos como válido es, a su vez, compatible con nuestro ordenamiento constitucional. Ver, *e.g., E.L.A. v. Coca Cola Bott. Co.*, supra, pág. 208. Según vimos al comienzo de nuestra discusión, la citación que nos ocupa dispone que los documentos solicitados bajo el inciso (e) son aquellos "que nuestros auditores estimen pertinentes". También dispone que éstos "serán entregados el 16 de noviembre de 1989 a las 9:00 a.m. en las oficinas de HMCA Carolina, Inc., localizadas en el Hospital de área de Carolina, y se les permitirá a los

representantes de la Oficina del Contralor inspeccionarlos o reproducirlos, según éstos determinen". Solicitud de revisión, Apéndice, pág. 38. Ambas instrucciones, leídas en conjunto, implican que los auditores de la Contralor pretenden registrar los archivos de H.M.C.A. en busca de documentos pertinentes a su investigación. Tanto la Contralor como H.M.C.A. dieron por sentado que esto era así, y discutieron extensamente en sus respectivos alegatos la aplicabilidad del requisito de orden de registro.

■ Primeramente, advertimos que ni la cláusula de la Constitución que crea el cargo de Contralor ni su ley habilitadora confieren a ese funcionario facultad expresa para realizar inspecciones. Lo anterior no es óbice para reconocer esa facultad como una implícita e inherente a sus funciones. Como explicamos al principio de esta ponencia, la Contralor goza de poderes investigativos tan amplios como sean necesarios para desempeñar cumplidamente su encomienda constitucional. Al definir los contornos de esos poderes, no podemos perder de vista que la Contralor, en su quehacer, "podrá emplear las normas generalmente aceptadas o métodos que estén de acuerdo con prácticas corrientes en el examen de cuentas". Art. 3 de la Ley Núm. 9, *supra*, 2 L.P.R.A. sec. 71. Por lo tanto, si la práctica corriente es que los auditores trabajen desde las propias oficinas de la entidad bajo examen y que allí determinen qué documentos desean ver para su estudio, la Oficina del Contralor debe tener la facultad para realizar ese tipo de intervención. Nos corresponde dilucidar si para ello necesita una orden judicial de allanamiento.

■ La Cuarta Enmienda de la Constitución federal garantiza que todo registro gubernamental se hará en virtud de una orden fundamentada en causa probable, fundada en juramento o afirmación. Valga señalar que no toda intervención gubernamental es un registro a la luz de esta enmienda. Ocurre un registro sólo cuando la expectativa razonable de intimidad de una persona ha sido

transgredida. Véanse: *California v. Ciraolo*, 476 U.S. 207, 209 (1986); *Smith v. Maryland*, 442 U.S. 735, 740 (1979); *Katz v. United States*, 389 U.S. 347, 351–352 (1967); E.L. Chiesa, *Derecho Procesal Penal de Puerto Rico y Estados Unidos*, Colombia, Ed. Forum, 1991, Vol. I, Sec. 6.13, pág. 404.

Al interpretar el alcance de la Cuarta Enmienda, el Tribunal Supremo federal ha demostrado una tendencia a relajar las exigencias de la norma constitucional en cuanto se refiere al requisito de una orden judicial. A pesar de que ha llegado a exigir que los registros administrativos de propiedad privada, incluso de facilidades comerciales, se lleven a cabo en virtud de orden judicial de allanamiento (*Marshall v. Barlow's, Inc.*, 436 U.S. 307, 324 (1978); *See v. City of Seattle*, 387 U.S. 541, 543 y 545–546 (1967); *Camara v. Municipal Court*, 387 U.S. 523 (1967)), las excepciones a ese principio se han interpretado de manera cada vez más flexible. Chiesa, *op. cit.*, pág. 470.[20] Frente a necesidades especiales del Estado, el Tribunal Supremo federal no ha titubeado en balancear el interés de intimidad involucrado, contra el interés gubernamental, para determinar si es práctico exigir que, en el caso particular, el Estado cumpla con los requisitos de orden y causa probable. *Skinner v. Railway Labor Executive's, Assn.*, 489 U.S. 602, 619 (1989).

En los casos en que no se puede prescindir de la orden judicial, el criterio de causa probable para su expedición es

---

[20] A manera de ejemplo, se ha determinado que cuando la evidencia se obtiene a plena vista o en un campo abierto, ni siquiera se entiende que ha habido un registro a los efectos de la Cuarta Enmienda. Véanse, *e.g.*: *Florida v. Riley*, 478 U.S. 445, 449–450 (1989); *Dow Chemical Co. v. United States*, 476 U.S. 227 (1986); *Air Pollution Variance Bd. v. Western Alfalfa*, 416 U.S. 861, 865 (1974). Pero aún en casos en que sí se da un registro, no se exige una orden cuando el registro responde a una emergencia. Ver, *e.g.*, *Cady v. Dombrowski*, 413 U.S. 433, 447–448 (1973). Tampoco se activa la protección constitucional cuando se trata de documentos que son propiedad pública y que la ley requiere que se lleven en un negocio, *Davis v. United States*, 328 U.S. 582, 593 (1946), o cuando el registro ocurre en el contexto de industrias o negocios ampliamente reglamentados. *Donovan v. Dewey*, 452 U.S. 594, 598 (1981) (condiciones de seguridad laboral en las minas); *United States v. Biswell*, 406 U.S. 311, 315 (1972) (venta de armas de fuego autorizada por licencia); *Colonnade Corp. v. United States*, 397 U.S. 72, 76–77 (1970) (venta de licores mediante licencia).

extremadamente laxo. Bastaría con que la inspección tuviese como objetivo un interés gubernamental legítimo y que estuviera dentro de la autoridad de la agencia. *Okla. Press Pub. Co. v. Walling*, supra, pág. 209; 1 *Davis, Administrative Law Treatise* Sec. 4.7 (2da ed. 1978). De existir suficientes parámetros razonables en los estatutos o reglamentos que autoricen el registro particular de que se trate, se cumple con el requisito de causa probable y se justifica la expedición de una orden. *Griffin v. Wisconsin*, 483 U.S. 868, 873 (1987); *Donovan v. Dewey*, 452 U.S. 594, 599–600 (1981); *Marshall v. Barlow's Inc.*, supra, pág. 320; *Camara v. Municipal Court*, supra, pág. 538.

En *New York v. Burger*, 479 U.S. 812 (1987), el Tribunal Supremo federal refrendó la validez de un estatuto que autorizaba el registro sin orden de los negocios de venta de chatarra (*junkers*). Determinó que la razonabilidad de un registro administrativo sin orden de una industria ampliamente reglamentada depende de que el esquema regulador en virtud del cual se pretende realizar el registro reúna tres (3) requisitos. Primeramente, debe responder a un interés gubernamental sustancial. Segundo, la inspección sin orden debe ser necesaria para la consecución efectiva de sus objetivos. Finalmente, el programa ha de estar diseñado de modo que provea un sustituto constitucionalmente adecuado para la orden de registro. Esto último implica que debe proveer certeza y regularidad en cuanto al tiempo, lugar y alcance del registro. *New York v. Burger*, supra, págs. 702–703 y 711; Chiesa, *op. cit.*, págs. 471–472.

 La Sec. 10 del Art. II de nuestra Carta de Derechos, *supra*, también exige que todo registro se haga en virtud de una orden judicial previa y fundada en causa probable. Los registros administrativos no están exentos de este imperativo. En este contexto, hemos reconocido un mayor alcance a nuestra garantía contra registros y allanamientos irrazonables que el mínimo exigido bajo la

Cuarta Enmienda de la Constitución federal. Chiesa, *op. cit.*, págs. 406 esc. 335, 407 y 408.

En *E.L.A. v. Coca Cola Bott. Co.*, supra, reseñamos los requisitos que debe reunir un registro administrativo para ser compatible con nuestra garantía constitucional contra registros irrazonables. Explicamos entonces que, al igual que en lo criminal, un registro administrativo debe hacerse en virtud de una orden expedida a partir de una determinación de causa probable. De lo contrario, se presume irrazonable aun cuando el lugar registrado sea un establecimiento comercial.

En la citada decisión, advertimos que en el ámbito administrativo el criterio de causa probable asume dimensiones distintas a las que hemos exigido en el ámbito criminal. Así, mientras menos se asemejen las consecuencias del registro administrativo a las de un registro penal, más flexible serán los parámetros que rijan la determinación de causa probable. *E.L.A. v. Coca Cola Bott. Co.*, supra, págs. 212–213. Indicamos que, al solicitar la orden de allanamiento, la agencia debe proveer al juez de los hechos que demuestren la ausencia de arbitrariedad en la selección del lugar a inspeccionarse, así como la razonabilidad del registro a la luz de su alcance y onerosidad. *Íd.*, págs. 215 y 217.

Intimamos entonces que una autorización legislativa para el registro no exime necesariamente a la agencia de obtener una orden judicial de allanamiento. *E.L.A. v. Coca Cola Bott. Co.*, supra, pág. 208.[21] El mencionado

---

[21] Aludimos entonces a la desición del Tribunal Supremo federal en *Marshall v. Barlows, Inc.*, 436 U.S. 307 (1978). La jurisprudencia aún no contaba con los pronunciamientos de *New York v. Burger*, 479 U.S. 812 (1987). Aunque en *Pueblo v. Rodríguez*, 107 D.P.R. 804 (1978), refrendamos un registro sin orden por parte del Secretario de Hacienda a un establecimiento dedicado a la venta de bebidas alcohólicas, *E.L.A. v. Coca Cola Bott. Co.*, 115 D.P.R. 197 (1984), limitó el alcance de esta decisión. En *Pueblo v. Rodríguez*, supra, se cuestionaba si la facultad de inspeccionar que expresamente confiere la Ley de Bebidas al Secretario de Hacienda, 13 L.P.R.A. sec. 6101, se extendía a negocios que vendían bebidas alcohólicas sin haber obtenido una licencia para ello. No se planteó directamente si esa facultad sólo podía ejercerse

principio constitucional cede tan solo en contadas excepciones. Tal es el caso cuando se consiente directa o indirectamente al registro, cuando existen circunstancias apremiantes o cuando el peso de los intereses requiere otra solución. *E.L.A. v. Coca Cola Bott. Co.*, supra, págs. 207–208.

La Ley de Procedimiento Administrativo Uniforme del Estado Libre Asociado de Puerto Rico, Ley Núm. 170 de 12 de agosto de 1988 (3 L.P.R.A. secs. 2101 *et seq.*) incorporó la normativa constitucional. Su Sec. 6.1 (3 L.P.R.A. sec. 2191) consagra la facultad de las agencias de realizar inspecciones para asegurarse del cumplimiento de las leyes y los reglamentos que administran, y de las órdenes que expidan. 3 L.P.R.A. sec. 2191. Sujeta el ejercicio del poder de inspeccionar a que se obtenga una orden previa de registro, salvo en tres (3) ocasiones: en casos de emergencia, cuando el registro se efectúa al amparo de las facultades de conceder licencias o permisos, o en casos que la información sea obtenible a simple vista. La Oficina de la Contralor no es de las agencias o instrumentalidades del Estado expresamente excluidas del ámbito de esta ley. 3 L.P.R.A. sec. 2102(a). Véase *Pagán Ramos v. F.S.E.*, 129 D.P.R. 888 (1992).[22]

Apliquemos la normativa antes expuesta a los hechos ante nuestra consideración. No están presentes en el caso de autos ninguna de las circunstancias bajo las cuales po-

---

en virtud de una orden judicial de allanamiento. *E.L.A. v. Coca Cola Bott. Co.*, supra, enfrentó ese último planteamiento y, en esa medida, limitó expresamente el alcance de los pronunciamientos en *Pueblo v. Rodríguez*, supra, a unos de interpretación estatutaria de la facultad investigativa administrativa. *E.L.A. v. Coca Cola Bott. Co.*, supra, pág. 207.

[22] Con fecha de 3 de abril de 1989, el Secretario de Justicia emitió una opinión en cuanto a la aplicabilidad de la Ley de Procedimiento Administrativo Uniforme del Estado Libre Asociado de Puerto Rico, Ley Núm. 170 de 12 de agosto de 1988 (3 L.P.R.A. sec. 2101 *et seq.*) a la Oficina del Contralor. Luego de un extenso análisis de hermenéutica, concluye la citada opinión: "... si el legislador hubiese querido excluir a la Oficina del Contralor del marco de aplicabilidad de la ley [de Procedimiento Administrativo Uniforme] lo hubiese manifestado, excluyéndola expresamente o a la Rama Legislativa en su totalidad, según lo hizo con la Rama Judicial". Op. Sec. Just. Núm.1989-70.

dríamos reconocer una excepción al imperativo constitucional de que todo registro gubernamental se haga sólo conforme a una orden judicial expedida en virtud de una determinación previa de causa probable.

H.M.C.A. no ha consentido a un registro tan extenso como el contenido en la citación. Del contrato que firmó con el Departamento de Salud no surgía que sus negocios relativos a la prestación de servicios médicos a pacientes privados estarían sujetos a una auditoría exhaustiva por parte del Departamento, y mucho menos por parte de la Oficina del Contralor del Estado Libre Asociado.([23]) No puede deducirse su consentimiento implícito a ese tipo de registro del hecho de que haya contratado con el Gobierno. La relación contractual por sí sola no la despoja de su derecho a no ser intervenida por éste de manera irrazonable.

Tampoco existe en este caso una circunstancia apremiante o una emergencia identificable que justifique dispensar del requisito de obtener una orden de allanamiento. Finalmente, el peso de los intereses no nos inclina a resolver que el derecho de H.M.C.A. a no ser intervenida por el Gobierno de manera irrazonable deba ceder ante un registro por la Contralor, especialmente en un caso como el de marras, en que está involucrada la contratación del Estado con la empresa privada. Además, como veremos inmediatamente, el requisito de una orden no es oneroso para la

---

([23]) El Congreso federal ha estimado prudente requerir que se incluya en algunos contratos una cláusula de acceso a libros, documentos y archivos de un subcontratista privado. La Sec. 1861(v)(1)(I) de la Ley del Seguro Social, según enmendada, 42 U.S.C. sec. 1395x(v)(1), requiere que, si el valor de los servicios de salud a prestarse por un subcontratista excede de $10,000 en un periodo de doce meses, el contrato contenga una cláusula que obligue al subcontratista a permitir que el Secretario de Salud y el Contralor General federal examinen sus libros, documentos y archivos hasta pasados cuatro años de rendidos los servicios. El examen se extenderá a aquellos libros, documentos y archivos que sea necesario revisar para determinar si el subcontratista ha incurrido en costos razonables reembolsables por Medicare. Esa legislación está codificada en 42 C.F.R., Sub–Parte D, sec. 420.300–304.

Para otras instancias en que el Congreso federal ha impuesto el mismo requisito de la cláusula contractual de acceso a libros, documentos y archivos de partes privadas, véase 41 U.S.C. 254(c) (contratos con el gobierno que no se hayan otorgado mediante el mecanismo de subasta) y 10 U.S.C. 2313(b) (contratos bajo la Ley Militar General).

Contralor, en comparación con los beneficios que su obtención puede acarrear tanto a H.M.C.A. como a la propia Contralor.

Por otro lado, aun si optáramos por incorporar a nuestro acervo constitucional los pronunciamientos del Tribunal Supremo federal en *New York v. Burger*, supra, no podríamos refrendar un registro sin orden en este caso. No creemos que aplique en este contexto la excepción al requisito de orden que se ha adoptado al amparo de la Constitución federal para las industrias extensamente reglamentadas. Varias son las razones que nos persuaden a proceder así. Explicaremos esta postura partiendo de la premisa de que la prestación de servicios médicos está extensamente reglamentada y que dicha reglamentación responde a un interés gubernamental sustancial. Aceptamos así que se cumple con el primer requisito que señaló el Tribunal Supremo federal en *New York v. Burger*, supra, para aplicar la excepción al requisito de una orden en casos de industrias extensamente reglamentadas.

Primeramente, la Contralor no ha demostrado que el obtener una orden opere en detrimento de la intervención que desea realizar. Por el contrario, en todo caso la obtención de la orden de registro facilita su intervención. Es un procedimiento *ex parte*, más expedito que el procedimiento contencioso que pudiera surgir si el requerido no consiente al registro. Obtenerla con antelación al registro preserva el elemento de sorpresa, que pudiera ser deseable en este tipo de intervención, y que pudiera perderse si el requerido rehúsa someterse al registro y la Contralor se ve obligada a acudir posteriormente al tribunal para obtener una orden de desacato.[24] Véase *Marshall v. Barlow's Inc.*, supra, págs. 316–320. Puesto que no se nos ha demostrado que los

---

[24] Debemos señalar, además, que el uso de la fuerza para realizar un registro sólo procede cuando se ha obtenido una orden de allanamiento, aun cuando el legislador haya autorizado los registros sin orden y se trate de una industria extensamente reglamentada, a menos que el uso de la fuerza se autorice también en el estatuto. *Colonnade Corp. v. United States*, supra, pág. 74.

registros sin una orden sean esenciales a la consecución de las funciones del Contralor, no se cumple el segundo de los tres (3) requisitos de *New York v. Burger*, supra.

Segundo, ya advertimos que la Contralor no ha recibido una autorización legislativa expresa para realizar registros. Por lo tanto, no existen parámetros adecuados que puedan guiar la discreción de la Contralor durante su inspección de los documentos corporativos de H.M.C.A. En consecuencia, no se cumple el tercero de los tres requisitos de *New York v. Burger*, supra, a saber: que el estatuto al amparo del cual se pretende realizar el registro provea un sustituto adecuado para la orden.

Tampoco creemos que la Contralor pueda invocar las facultades concedidas por ley al Secretario de Salud para realizar un registro sin una orden. Al analizar si el estatuto que autoriza el registro sin una orden cumple con el requisito de proveer suficiente certeza y regularidad, debe atenderse a si éste señala quién es el funcionario autorizado para efectuar la inspección. Ver, *e.g.*, *New York v. Burger*, supra, pág. 711. De igual modo, para que aplique la excepción de industria extensamente reglamentada, la empresa a registrarse debe caer bajo la jurisdicción de una agencia investida con poder de reglamentar la industria particular de que se trate. Schwartz, *Administrative Law*, 1984, pág. 103. En este caso, es el Secretario de Salud, no la Contralor, el funcionario señalado por el estatuto para realizar el registro. Es el Departamento de Salud, no la Oficina de la Contralor, la agencia encargada de la administración de la reglamentación en materia de servicios de salud. Es, pues, el Secretario de Salud quien podría, en todo caso, invocar la facultad para realizar inspecciones sin orden, al amparo de su facultad de conceder licencias para la operación de servicios de salud.

De modo que, cuando la sección 6.1 de la Ley de Procedimiento Administrativo Uniforme del Estado Libre Asociado de Puerto Rico, *supra*, consagró como excepción al

requisito de orden aquel registro que se efectúa al amparo de las facultades de conceder licencias, lo hizo para permitir que las agencias se aseguraran del cumplimiento de las leyes y los reglamentos que administran. 3 L.P.R.A. sec. 2191. Puesto que el Departamento de Salud administra las leyes y los reglamentos relativos a las facilidades de salud, el Secretario de Salud podría invocar la excepción al requisito de una orden cuando efectúa un registro al amparo de su facultad de conceder licencias.

Pero actualmente, cuando la Contralor efectúa un registro de los archivos de una corporación privada que administra una facilidad de salud, no lo hace al amparo de una facultad de conceder licencias ni al palio de legislación que específicamente autorice su intervención. Tampoco las partes suplieron la falta de autorización legislativa mediante alguna cláusula contractual en la cual H.M.C.A. consintiera al registro por parte de la Oficina de la Contralor.

Más aún, si pudiera quedar alguna duda sobre la necesidad de que la Contralor obtenga una orden antes de efectuar un registro, la propia Ley de Procedimiento Administrativo Uniforme del Estado Libre Asociado de Puerto Rico, de la cual la Oficina de la Contralor no está exceptuada, le impone el requisito estatutario de obtener una orden previa a la realización de una inspección.

En vista de todo lo anterior, resolvemos que la Contralor necesita una autorización judicial antes de registrar los archivos de H.M.C.A. en búsca de los documentos pertinentes a su investigación. Sin embargo, bajo las circunstancias de este caso, no es necesario devolver el caso al foro de instancia para que la Contralor demuestre que tiene causa probable para el registro. La Contralor ya cumplió cabalmente con ese requisito. En su comparecencia ante el foro de instancia y ante nos, la Contralor ha presentado evidencia concreta que justifica la razonabilidad de la intervención que desea llevar a cabo. Explicamos.

En *E.L.A. v. Coca Cola Bott. Co., supra,* determinamos que, cuando la solicitud de orden de registro se fundamente en la supuesta violación de alguna disposición legal, no basta con que la agencia afirme que tiene motivos fundados para creer que los requeridos han violado alguna ley o reglamento. Ha de explicar en qué se fundamentan esos motivos, la naturaleza de la supuesta violación y la fecha de su ocurrencia, hasta donde alcance la información en su poder; además, se informará la fecha en que advino en conocimiento de la misma, el día, la hora y el objetivo (civil o penal) de la inspección, su pertinencia y la autorización estatutaria en virtud de la cual se realiza el registro. *E.L.A. v. Coca Cola Bott. Co.,* supra, pág. 216.

Distinto de la situación fáctica en *E.L.A. v. Coca Cola Bott. Co.,* supra, en el caso de marras la solicitud para registrar a la recurrente no se fundamenta en una supuesta violación de ley. El objetivo que persigue la intervención es, precisamente, determinar si algún tipo de irregularidad ha ocurrido. De ahí que la expedición de la orden deba atender a la razonabilidad del requerimiento a la luz del interés del Estado en proteger al erario contra un posible fraude.

En este caso, la Contralor ha ilustrado al tribunal sobre los hechos concretos que motivan la investigación, la autoridad de ley bajo la cual la lleva a cabo, los objetivos del registro y la pertinencia de la información que se busca con el asunto legítimamente bajo investigación. A la luz de la información presentada, el foro de instancia podía concluir que era razonable el registro, en vista del interés público implicado.

## V

Por cuanto antecede, *se modificará la sentencia recurrida para requerir que el registro en cuestión se lleve a*

*cabo mediante una orden judicial de allanamiento y se devolverá el caso al Tribunal Superior para que expida la referida orden conforme a los pronunciamientos vertidos en esta opinión.*

El Juez Asociado Señor Fuster Berlingeri emitió una opinión disidente. El Juez Presidente Señor Andréu García y los Jueces Asociados Señor Negrón García y Señora Naveira de Rodón se inhibieron.

— O —

Opinión disidente emitida por el Juez Asociado Señor Fuster Berlingeri.

No estoy de acuerdo con la medular determinación que hace la mayoría de que la entidad recurrente, H.M.C.A., es una corporación privada común y corriente que, como cualquier otra empresa comercial privada, está protegida por las garantías constitucionales que exigen de ordinario que todo registro se haga en virtud de una orden judicial previa y fundada en causa probable. Para mí, la entidad recurrente, en el contexto del caso ante nos, se asemeja más bien a las corporaciones público-privadas, *Commoloco of Caguas, Inc. v. Benítez Díaz*, 126 D.P.R. 478 (1990); *P.R. Tel. Co. v. Rivera*, 114 D.P.R. 360 (1983), y, por lo tanto, no es constitucionalmente indispensable que la Contralor de Puerto Rico obtenga una orden judicial de registro antes de poder examinar los libros, documentos y expedientes relativos al uso que hace dicha entidad de las facilidades del Hospital Subregional de Carolina. En las circunstancias particularísimas de este caso, el peso de los intereses en conflicto, según mi criterio, se inclina a favor de eximir a la Contralor de la carga al expedito desempeño de sus funciones que implica someter su clara autoridad a la supervisión judicial previa.

La situación concreta que tenemos ante nos no es la de un registro administrativo de los libros y documentos de una empresa privada ordinaria. Como surge claramente de la propia opinión mayoritaria, tratamos aquí con una entidad *sui generis* que, en lo que se refiere al uso de las facilidades del hospital en cuestión, es realmente un *alter ego* del Estado. Los datos siguientes avalan esta conclusión. Primero, el contrato de la entidad con el Departamento de Salud es para administrar y operar una *facilidad pública*, construida con fondos públicos a un costo de $29.5 millones. Segundo, para el funcionamiento del hospital en cuestión conforme al contrato con la recurrente, el Departamento de Salud desembolsó para el año fiscal 1988–1989 el gran total de $56.6 millones de *fondos públicos*. Tercero, en virtud del contrato con el Departamento de Salud, la entidad asumió la obligación de proveer servicios hospitalarios y ambulatorios a los pacientes médico-indigentes de la región de Carolina, o sea, la realización de una *primordial función pública*. Cuarto, tanto en virtud de su contrato con el Departamento de Salud como por disposición de las varias piezas legislativas aplicables,[1] la entidad está sujeta a una *extensa e íntima supervisión y reglamentación gubernamental*.

A la luz de los hechos aludidos es evidente que H.M.C.A. es esencialmente el medio estrechamente regulado mediante el cual el Estado realiza, en una facilidad pública y

---

[1] Tanto la Ley Núm. 101 de 26 de junio de 1965 (24 L.P.R.A. secs. 331–333p) según enmendada, como la Ley Núm. 56 de 21 de junio de 1969 (24 L.P.R.A. secs. 61–61k) la Ley Núm. 26 de 13 de noviembre de 1975 (24 L.P.R.A. sec. 337 *et seq.*) y la Ley Núm. 103 de 12 de julio de 1985 (24 L.P.R.A. secs. 338–338r) tienen tangencia con la operación del Hospital Regional de Carolina por H.M.C.A. Dichas leyes conceden amplias facultades al Secretario de Salud para efectuar investigaciones de las facilidades médico-hospitalarias del país tanto públicas como privadas. También establecen requisitos de licenciamiento; imponen requisitos de calidad en los servicios que se ofrecen; fijan requisitos de auditoría fiscal y auditoría médica, y autorizan extensamente al Secretario a adoptar reglamentos. La Ley Núm. 103, *supra*, en particular, requiere que las entidades contratadas por el Secretario de Salud para prestar servicios médico-hospitalarios preparen anualmente unos informes de auditoría, informes de evaluación de las operaciones y un estudio de opinión pública. 24 L.P.R.A. sec. 338*l*

con fondos públicos, una eminente función gubernamental. Esta realidad jurídica es la que hace válida la contratación del hospital por H.M.C.A., no obstante el impreterible mandato del Art. VI, Sec. 9 de nuestra Constitución, L.P.R.A., Tomo 1, en contra del uso de propiedades y fondos públicos para beneficio privado. *P.S.P. v. E.L.A.*, 107 D.P.R. 590 (1978).

La H.M.C.A., pues, aunque se creó en sus orígenes como una corporación privada, en cuanto al contrato con el Departamento de Salud para administrar y operar el hospital público se refiere, era una entidad intensamente revestida de carácter estatal y, como tal, sujeta a las facultades del Contralor para fiscalizar los fondos públicos, similar o análogo a lo que ocurre cuando los fondos públicos están en manos de corporaciones público-privadas.

Al ponderar este asunto es menester tener en cuenta que estamos ante una situación de *registro administrativo* en la cual las normas constitucionales pertinentes son más flexibles que en los casos del registro penal. E.L. Chiesa, *Derecho Procesal Penal de Puerto Rico y Estados Unidos*, Colombia, Ed. Forum, 1991, Vol. I, Sec. 6.21, pág. 470. En esta área el Tribunal Supremo federal ha convalidado, por ejemplo, la inspección gubernamental sin una orden judicial de un establecimiento comercial dedicado a la venta de piezas usadas y automóviles desmantelados (*junker*) en *New York v. Burger*, 479 U.S. 812 (1987). Si tal inspección es permisible, ciertamente también debe ser válido el registro que interesaba la Contralor de Puerto Rico en este caso, en el que la entidad estaba mucho más investida de carácter público que la del caso *New York v. Burger*, supra.

Por otro lado, el Tribunal Supremo federal ha convalidado que el hogar de personas privadas que reciben beneficios de bienestar público pueda ser inspeccionado sin orden judicial en *Wyman v. James*, 400 U.S. 309 (1971), y que la oficina y el escritorio de un médico empleado por un hospital estatal también esté sujeto a registros sin una or-

den judicial en *O'Connor v. Ortega,* 480 U.S. 709 (1987). Si estos lugares tradicionalmente protegidos por la Constitución pueden ser inspeccionados así con base a la conexión estatal que existía, también debe permitirse la del caso de marras, en el cual lo que se va a registrar tiene menos carácter personal o íntimo y la conexión estatal es mayor.

A fin de cuentas, el asunto se reduce a sopesar los intereses legítimos del Estado frente a los de la particular entidad en cuestión. *E.L.A. v. Coca Cola Bott. Co.,* 115 D.P.R. 197, 215 (1984). Aquí tenemos la poderosa concurrencia de los apremiantes intereses del Departamento de Salud ya aludidos con los de la preeminente institución pública del Contralor, creada directamente por nuestra Constitución con la encomienda de "fiscaliza[r] todos los ingresos, cuentas y desembolsos del Estado", para lo cual *la propia Constitución* le autoriza a inspeccionar los "libros, cartas, documentos, papeles, expedientes, y todos los demás objetos que sean necesarios para un completo conocimiento del asunto bajo investigación". Art. III, Sec. 22, Const. E.L.A., L.P.R.A., Tomo 1, ed. 1982, págs. 347 y 348. Frente a esa abrumadora conjunción de apremiantes intereses públicos, y ante los claros mandatos del Art. VI, Sec. 9 de la Constitución del E.L.A., L.P.R.A., Tomo 1, y del Art. III, Sec. 22 de nuestra Constitución, *supra,* es muy difícil entender cómo es que puede prevalecer el interés de la corporación recurrente, que por no ser una empresa comercial ordinaria, tiene en las circunstancias de este caso bases muy escasas y frágiles, si algunas. Por ello disiento de la posición de la mayoría.